IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BEVERLY J. BEARD,               §
                                §
VS.                             §   CIVIL ACTION NO.4:11-CV-383-Y
                                §
                                §
BUREAU OF PRISONS, et al.       §

OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In this case, former FMC--Carswell inmate Beverly J. Beard has claims remaining against individual defendants Hernan Reyes, M.D., clinical director; Elaine Chapman, former warden; Bill Pendergraft, counselor; and Pedro Hernandez and Ronda Hunter, health administrators. Beard's pleadings consist of an amended complaint and a more definite statement filed by Beard in response to this Court's order. The Court previously dismissed, under authority of 28 U.S.C. §§ 1915A and 1915(e)(2)(B), other claims asserted by Beard.[1] Each of the remaining defendants has appeared in this case by filing a motion to dismiss, along with a brief in support and an appendix.[2] The Court construed each motion as seeking summary judgment. In response to each motion, except the motion filed by Chapman, Beard filed a document construed as a response,[3] the defendants filed a reply, and Beard then filed a document construed

_____

[1]The Court dismissed all claims against the Bureau of Prisons, the Department of Justice, and against individual defendants Joe Keffer, A.S. Stone, Harley G. Lappin, and an unnamed medical director for the Bureau of Prisons.

[2]Hernandez and Hunter filed a combined motion, and Warden Chapman acknowledges that her motion seeks the same relief on the same grounds as asserted by Bill Pendergraft.

[3]In each instance, Beard's "response' was entitled "Motion to Continue Claim Against . . . [each defendant's name]." (Docket entries 34, 35, and 36).

as a sur-reply.[4]

By his motion for summary judgment, Reyes asserts an entitlement to absolute immunity from Beard's claim that he was deliberately indifferent to her serious medical needs. Defendants Hernandez and Hunter contend that Beard failed to exhaust her administrative remedies such that her claims must be dismissed. Defendants Pendergraft and Chapman also claim that Beard failed to exhaust administrative remedies as to some claims, and claim that they are entitled to qualified immunity on others. For the reasons set forth below, the Court concludes that each motion for summary judgment must be granted.

*Summary-Judgment Evidence*

Defendant Hernan Reyes filed an appendix in support of the motion for summary judgment that includes the April 10, 2013 Declaration of Hernan Reyes, M.D. (pp. 3-4). An appendix filed in support of all of the motions on the basis of failure to exhaust administrative remedies includes the April 5, 2013 Declaration of Maria Martinez, along with two pages of records of the Bureau of Prisons (BOP). Beard provided an appendix with her responses, that includes the May 25, 2013 Declaration of Beverly J. Beard (entitled "Affidavit"), along with 15 pages of records of the BOP. Beard also verified her complaint and more definite statement, and thus the Court will consider those pleadings as summary-judgment

---

[4]In each instance, Beard's "sur-reply" was actually entitled "Reply Brief of [each defendant's name] to Continue Under 'Color of Federal Law.'"

2

evidence.[5] The Court has considered copies of records attached to Beard's amended complaint.[6] Beard also submitted photographs subsequent to the filing of her more definite statement, alleged to show discoloration of her skin, which the Court construed and had filed as exhibits to the more definite statement.[7]

*Summary-Judgment Standard*

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.[8] "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."[9] A fact is "material" if it "might affect the outcome of the suit under governing law."[10]

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff

---

[5]*See Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1989)(noting that although unsworn affidavit is incompetent to raise a fact issue precluding summary judgment, the statutory exception in 28 U.S.C. § 1746 permits unsworn declarations to substitute for an affidavit if made "under penalty of perjury" and verified as "true and correct.")

[6]As Beard did not number these attachment pages, the Court will refer to them with their Electronic Case File (ECF) number assigned when the March 12, 2012 amended complaint was scanned and docketed.

[7]July 16, 2012 Correspondence with attached photographs(docket 14); October 22, 2012 Opinion and Order of Partial Dismissal, at 14.

[8]Fed. R. Civ. P. 56(a).

[9]*Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)(citation omitted).

[10]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3

has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact.[11] Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record.[12] Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[13] Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim."[14]

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor."[15] "After the non-movant [here, Plaintiff] has been given the opportunity to raise a  genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted."[16]

*Facts*

The relevant facts are taken from Beard's pleadings. Beard arrived at FMC--Carswell, a medical facility for female prisoners

---

[11]Fed. R. Civ. P. 56(c)(1).

[12]*See* Fed. R. Civ. P. 56(c)(3).

[13]*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992).

[14]*Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

[15]*Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted)(internal quotation marks omitted).

[16]*Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

operated by the Bureau of Prisons (BOP), in July 2009. (Amend. Compl. § V; More Definite Statement (MDS) ¶ 4(A).) Beginning in September 2009, Beard was housed in the Chronic Care Unit, a multi-bed unit with thirteen other medically designated women. (Amend Compl. § V.) Due to the size and configuration of this unit, Beard claims that she was required to sleep only 24 inches away from another inmate allegedly having a staphylococcus infection. (Amend Compl. § V; MDS ¶ 4(A).)

Upset about the housing arrangements in the Chronic Care Unit, Beard "complained about the proximity of the beds and the infectious inmate to Counselor William [Pendergraft]." (Amend. Compl. § V.) She also relates that she wrote a "cop-out" (an informal request for resolution to prison staff) seeking to have the infected inmate removed from the Chronic Care Unit, but this request was denied. (MDS ¶¶ 6, 10.) Beard writes that she complained to Pendergraft both orally and in writing. (MDS ¶ 6.) Beard also recites that she complained about the housing to prison staff and to then-warden Chapman at "Mainline."[17] (Amend. Compl. § V; MDS ¶ 4(A).) Beard also alleges that while in the Chronic Care Unit, and as a result of having to "sleep 24 inches from an inmate infected with staphylococcus infection, she developed a rash that was treated with soap, water and hydrocortisone cream. (MDS ¶¶ 6, 10.) Beard recites that her housing in the Chronic Care Unit, near

---

[17]"Mainline" refers to regular occassions at which prison staff make themselves available to inmates for informal discussion and to receive and address informal complaints. *See Vinzant v. United States*, No.07-024 VAP, 2011 WL 6132741, at *9 (C.D. Cal. Sep. 2, 2011), *rep and rec. adopted, in part, rejected, in part* (Dec. 8, 2011).

another allegedly infected inmate, was cruel and unusual punishment, in violation of the Eighth Amendment. (MDS ¶¶ 4(A), 6.)

Beard was moved out of the Chronic Care Unit to a different area of FMC--Carswell, the South Unit, in December 2009. (Amend Compl. § V.) Beard recites that the conditions were also poor in the South Unit, with inmates having "every kind of medical conditions, diseases, including HIV, Hepatitis, and Herpes, and other illnesses housed together four to a one-man cubicle." (Amend. Compl. § V.) After being in the South Unit for a few weeks, Beard noticed on December 30, 2009, that she was developing eruptions or lesions on her lower abdomen and back. (Amend Compl. § V.) Copies of medical records provided by Beard show she was treated on December 31, 2009 for complaints to a "rash on trunk area," assessed as having herpes simplex, and given Acyclovir 800 mg-- five times a day, along with hydrocortisone cream. (Amend Compl., attachments 22-23.) Beard was again treated for a skin rash on January 8, 2010, with her subjective complaints of "infected lesions from scratching," assessed as "having other disorders of the skin," and given a prescription for Bacitracin/Polymyxin B ointment. (Amend. Compl. , attachments 25-26.) On January 19, 2010, Beard was again treated for an itchy skin rash, assessed to have Dermatomycosis, and given a prescriptions for Mionazole cream to apply topically. (Amend. Compl., attachments 27-29.)

Beard's allegations against Hernandez and Hunter relate to the medical treatment for her skin condition. Specifically, although Beard received medical treatment for the skin condition in late

2009 and early 2010, as listed above, Beard's request for follow-up care and treatment were disregarded or ignored by Hernandez and Hunter. (MDS ¶¶ 5(A), 5(B).)   Beard recites that Hernandez failed to acknowledge her skin eruptions, and ordered no blood work or follow-up care. (MDS ¶ 5(A).) Similarly, Hunter is alleged to have not responded to Beard's e-mails about the allegedly inadequate medical care and to have disregarded Beard's concerns expressed orally. (MDS ¶ 5(B).)

Beard alleges that she has suffered permanent scarring and discoloration of her abdomen and lower back area that is noticeable when she is showering and undressing. (Amend Compl. § V; MDS ¶ 14.) Beard allegations against Chapman and Pendergraft arise from her claims that they failed to intervene in response to her complains about her housing in the Chronic Care Unit. Beard contends that the alleged acts or omissions of Hernandez and Hunter with respect to her medical treatment constituted cruel and unusual punishment in violation of the Eighth Amendment. (MDS ¶¶ 5(A) 5(B).) Beard recites that defendant Reyes, was "supposed to head of clinic personnel," failed to answer specific questions she directed to him regarding her health and need for follow-up appointments, and "disregarded [her] request for personal information pertaining to the viral infection and follow-up care." (MDS ¶ 8.)

*Analysis--Absolute Immunity--Dr. Reyes*

Defendant Reyes seeks summary judgment on the basis that he is entitled to absolute immunity from Plaintiff's claim of deliberate indifference to her serious medical needs. Reyes asserts in the

summary-judgment motion that as an officer of the Public Health Service, 42 U.S.C. § 233(a) bars him from suit under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971) in his individual capacity for constitutional violations arising out of the performance of his official duties. Section 233(a) provides:

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.[18]

In *Hui V. Castaneda,* 559 U.S. 799 (2010), the Supreme Court determined that this language "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct."[19] The Supreme Court also stated that "[b]ased on the plain language of § 233(a), we conclude that PHS officers and employees are not personally subject to *Bivens* actions for harms arising out of such conduct."[20]

---

[18]42 U.S.C.A. § 233(a)(West 2003).

[19]*Castaneda*, 559 U.S. at 806.

[20]*Id.,* at 802.

Defendant Reyes provided a declaration in which he attests that, over the past 16 years, he has been a commissioned officer of the United States Public Health Service, presently detailed to the Health Resources and Service Administration, but that during the time of the events made the basis of this case, was detailed to the BOP at FMC--Carswell, where he last served as the Clinical Director. (Reyes Declaration ¶ 1.)   He also states that any involvement he may have had regarding the acts alleged in the complaint would have occurred within the scope of his official duties as clinical director at Carswell. (Reyes Declaration ¶¶ 2-3.)  Plaintiff raises arguments about the inapplicability of absolute immunity, but her arguments cannot overcome the application of the holding of *Hui v. Casteneda* to Reyes's service as a commissioned officer of the PHS. Based on the foregoing, this Court concludes that Beard's *Bivens* action against defendant Reyes is barred by absolute immunity. Thus, Reyes's motion for summary judgment should be granted on that basis.

*Failure to Exhaust Administrative Remedies*

The remaining defendants argue that as to the claims arising from Beard's care and treatment after her placement in the South Unit in late 2009, inclusive of all of Beard's claims against Hernandez and Hunter,[21] she failed to exhaust her administrative

---

[21]Defendants' Chapman and Pendergraft acknowledge that Beard properly completed all administrative exhaustion steps of her claims related to her housing and care in the Chronic Care Unit arising from the incidents in the fall of 2009. Defendants Chapman and Pendergraft assert the defense of qualified immunity to Beard's claim arising from the Chronic Care unit as discussed *infra*.

remedies prior to filing suit as required under 42 U.S.C. §
1997e(a). That statute provides that "[n]o action shall be brought
with respect to prison conditions under [42 U.S.C. § 1983], or any
other Federal law, by a prisoner confined in any jail, prison, or
other correctional facility until such administrative remedies as
are available are exhausted."[22] In *Booth v. Churner,* 532 U.S.
731(2001), the Supreme Court held that Congress intended thereby
that a prisoner must invoke whatever administrative grievance
remedies are available within a jail or prison, without regard to
whether the grievance procedure affords money-damage relief, before
he may bring a suit contesting prison conditions in federal court.[23]
Thus, exhaustion is required whether the plaintiff seeks
declaratory and injunctive relief, monetary damages, or both.[24] The
Supreme Court later clarified that the 1997e(a) exhaustion
requirement "applies to all inmate suits about prison life, whether
they involve general circumstances or particular episodes, and
whether they allege excessive force or some other wrong."[25] As the
United States Court of Appeals for the Fifth Circuit has explained:

> Quibbles about the nature of a prisoner's complaint, the
> type of remedy sought, and the sufficiency or breadth of
> prison grievance procedures were laid to rest in *Booth*.
> Justice Souter summed up the Court's conclusion in a
> footnote:
>> Here, we hold only that Congress has provided
>> in § 1997e(a) that an inmate must exhaust

---

[22]42 U.S.C.A. § 1997e(a)(West 2003).

[23]*Booth,* 532 U.S. at 738-41.

[24]*Id.*

[25]*Porter v. Nussle,* 534 U.S. 516, 532 (2002).

irrespective of the forms of relief sought and offered through administrative avenues.[26]

The Supreme Court later determined that the exhaustion required by 1997e(a) is "proper exhaustion," meaning that the inmate must complete whatever administrative review steps are provided in accordance with the applicable procedural rules, without any exception for untimely, unavailable, or procedurally defective attempts at exhaustion.[27]

At the time of the events made the basis of this complaint in June 2011, plaintiff Beard was still at FMC-Carswell, a Bureau of Prisons institution. Thus, Beard was required to first exhaust administrative remedies on all of her claims through the BOP. The federal Administrative Remedy Program established by the BOP is one through which an inmate may seek formal review of issues that relate to his confinement.[28] Other administrative procedures are in place for claims under the Federal Tort Claims, Inmate Accident Compensation, Freedom of Information, and Privacy Acts.[29] Under the Administrative Remedy Program, the inmate is to first submit a complaint informally to institution staff and, if the complaint is not resolved to his satisfaction, the inmate must commence a three-

---

[26]*Wright v. Hollingsworth,* 260 F.3d 357, 358 (5th Cir. 2001)(citing *Booth,* 532 U.S. at 741 n.6).

[27]*See Woodford v. Ngo,* 548 U.S. 81 (2006).

[28]28 C.F.R. § 542.10 (2012).

[29]28 C.F.R. § 542.10(b)(2012). The administrative remedy provisions applicable to a claim under the Federal Tort Claims Act are set out at 28 C.F.R. §§ 543.30-32(2012) and 28 C.F.R. § 14.1-14.11 (2012).

level administrative procedure within the BOP.[30] An inmate has not fully exhausted this administrative program until he has appealed through all levels.[31]

Beard did file a BP-9 administrative remedy form request with the institution, dated February 5, 2010, complaining of a skin condition and her South Unit housing. Beard's signed administrative-remedy request form read as follows:

> On December 29, 2009, while showering, I discovered several eruptions on my body (abdomen and back). At sick call, I was told that I had a skin virus, shingles./ I was placed on Acyclovir, 800 mg, five times daily for a period of seven days and hydrocortisone cream, twice daily. The exceeding conditions such as proximity of bedding, infectious inmates mixed with general population, and toxic levels of mold are causing many of the unsanitized [sic] conditions. I never had chicken pox, and to caught a form of shingles is terrifying. This is suppose to be a medical center for God's sakes. I don't need to be getting any communicable diseases at my age. Something definitely needs to be done.(Request for Administrative Remedy (Case No. 581910-F1), Defendant's Appendix at 7.)

Records show, however, that this request was withdrawn and was never ruled on by the warden at the institution level. (Martinez April 5, 2013 Declaration, Appendix 4.) Rather, on the section of the BP-9 form above, entitled "Response" and dated March 26, 2010, is written: "Resolution Resolved--Acyclovir and Hydrocortisone medication was given and taken starting 12/31/2009. Patient states

---

[30]*See* 28 C.F.R. §§ 542.14-15 (2012). The three steps above the informal-resolution stage take the complainant to the institution's administrator (warden) on a form known as a BP-9; then if dissatisfied, through appeal to the regional director on a form known as a BP-10; and, if the inmate remains dissatisfied, then finally to the BOP's central office (general counsel) using a BP-11 form.

[31]*Irwin v. Hawk,* 40 F.3d 347, 349 n.2 (11th Cir. 1994), *cert denied,* 516 U.S. 835 (1995).

the itching and rash is gone except for discoloration on lower
abdomen and back." (Request for Administrative Remedy (Case No.
581910-F1), Defendant's Appendix at 7.) This section is signed by
Beard and by J. Kirvin, identified as an RN. Beard acknowledges
that she met with J. Kirvin, a registered nurse on March 26, 2010.
(Beard May 25, 2013 Declaration at ¶ 2.) The records of the BOP
show that Beard did not otherwise take any regional or central
office appeals from the withdrawn BP-9 form. (April 5, 2013
Declaration of Martinez ¶¶ 5-6.) Although Beard argues that she
never received a copy of the form after meeting with Kirvin, and
that this prevented her from completing exhaustion, such argument
is unavailing. (Beard May 25, 2013 Declaration ¶ 2.) Because the
BP-9 was informally resolved, it was withdrawn without the need for
any formal response from the warden. (Declaration of Martinez ¶ 5.)
Accordingly, Beard has not exhausted any claims relating to follow-
up medical treatment of her skin condition, and she cannot proceed
in this Court with such claims.[32]

Beard has not exhausted administrative remedies relating to
her claims of inadequate follow-up medical care and evaluation of
her skin condition in 2010 before commencing this suit. Therefore,
the defendants' motion for summary judgment must be granted as to

---

[32]*See* 42 U.S.C. § 1997e(a)(West 2012); *see also McDowall v. Metro
Correctional Center,* No.08-CIV-8329, 2010 WL 649744, at * 5 (S.D.N.Y. Feb. 22,
2010)("[W]ithdrawal of an administrative remedy request prior to a decision on
the merits does not satisfy the PLRA exhaustion requirement"); *Lopez v. White*,
No. 07-CV-163, 2010 WL 152103, at *9 (N.D. W. Va. Jan, 14, 2010)(where an
administrative remedy request is filed but then informally resolved, with no
further attempt to exhaust administrative remedies, the claim is unexhausted);
*Foster v. Coody,* No.06-249, 2008 WL 544676, at *4 (M.D.La. Feb. 28, 2008)(a
withdrawn grievance fails to exhaust administrative remedies).

all such claims on the basis of lack of exhaustion.

*Qualified Immunity--Pendergraft and Chapman*

Defendants Pendergraft and Chapman seek summary judgment on Beard's claims arising from her housing in the Chronic Care unit in the fall of 2009, on the basis that they are entitled to qualified immunity from Plaintiff's claim of a constitutional violation.[33] The doctrine of qualified immunity "protects government officials from suit and liability for civil damages under § 1983[34] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[35] This is an affirmative defense that balances the important interests of holding "public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[36] Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be

---

[33]As noted above, any claims against defendants Chapman and Pendergraft arising from Beard's claims after her transfer to the South Unit were dismissed on the basis of lack of exhaustion. See footnote 21 *supra*.

[34]As Beard was in federal custody and names as defendants federal government officials, her claims are construed as seeking relief under *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics* ("*Bivens*"), 403 U.S. 388, 297 (1971). *Bivens,* of course, is the counterpart to 42 U.S.C. § 1983, and extends the protections afforded under § 1983 to parties injured by federal actors. *See Evans* v. *Ball*, 168 F.3d 856, 863 n. 10(5th Cir. 1999) ("A *Bivens* action is analogous to an action under § 1983--the only difference being that § 1983 applies to constitutional violations by state, rather than federal officials"), *overruled on other grounds*, *Castellano* v. *Fragozo*, 352 F.3d 939, 948-49 & n. 36 (5th Cir. 2003), *cert den'd*, 543 U.S. (2004).

[35]*Byers* v. *Navarro County*, No.3:09-CV-1792-D, 2012 WL 677203, at *2 (N.D.Tex. Mar. 1, 2012)(Fitzwater, CJ)(citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[36]*Pearson,* 555 U.S. at 231.

resolved at the earliest possible stage in the litigation.[37]

The Supreme Court has developed a two-step inquiry for resolving government officials' qualified immunity claims: (1) whether the facts that the plaintiff has **alleged** (at the motion-to-dismiss stage) or **shown** (at the summary-judgment stage) make out a violation of a constitutional or statutory right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.[38] Although the Supreme Court previously mandated that the two steps be resolved in sequence, in *Pearson v. Callahan*, it gave the lower courts permission to use discretion in deciding which of the two prongs to address first in light of the circumstances of the particular case.[39] In conducting the inquiry under the first prong--whether the Plaintiff has alleged or shown a violation of a constitutional right--the Court is to "employ currently applicable constitutional standards."[40] In this case, the Court will resolve the defendants' summary judgment motion through analysis of the first prong of the qualified immunity inquiry.

---

[37]*Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

[38]*Pearson,* 555 U.S. at 232 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).

[39]*Pearson,* 555 U.S. at 236 (rejecting the prior holding in *Saucier v. Katz,* that the analysis was a mandatory two-step sequence); *see also Lytle v. Bexar County, Tex.,* 560 F.3d 404, 409 (5th Cir. 2009), *cert. den'd,* 130 S.Ct. 1896 (2010).

[40]*Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004)(en banc).

A qualified-immunity defense alters the usual summary judgment burden of proof.[41]   When a defendant has asserted that defense in a summary-judgment motion, the burden then shifts to the plaintiff to demonstrate the inapplicability of the defense.[42]   But, being the non-moving party, all inferences are drawn in the plaintiff's favor.[43]   Nevertheless, conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation will not suffice.[44]

*Violation of a Constitutional Right*

The gravamen of Beard's claims against Pendergraft and Chapman is that she was required to share housing with, and sleep within a few feet of, a fellow inmate alleged to have a staph infection. (MDS ¶¶ 4(A), 6.) She alleges that each of these defendants subjected her to cruel and unusual punishment under the Eighth Amendment. (*Id.*) In order to establish a violation of the Eighth Amendment relating to an inmate's challenge to his conditions of confinement, two requirements must be met:

> First, the prison official's act or omission must be objectively serious, in that it "result[s] in the denial of the minimal civilized measure of life's necessities." *[Farmer]*, at 834 (citations and internal quotation marks omitted). "For a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under

---

[41]*See Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010), *cert. den'd,* 131 S.Ct. 2932 (2011).

[42]*McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir. 2002)(en banc)(per curiam).

[43]*See Brown,* 623 F.3d at 253.

[44]*See Edwards v. Loggins,* 476 F. App'x 325, 328 (5th Cir. 2012)(quoting *Oliver v. Scott,* 276 F.3d 736, 744 (5th Cir. 2002)).

conditions posing a substantial risk of serious harm."
*Id.* "Some conditions of confinement may establish an
Eighth Amendment violation in combination when each would
not do so alone, but only when they have a mutually
enforcing effect that produces the deprivation of a
single, identifiable human need such as food, warmth, or
exercise—for example, a low cell temperature at night
combined with a failure to issue blankets."*Wilson v.
Seiter,* 501 U.S. 294, 304 (1991)(emphasis, citations, and
internal quotation marks omitted).

Second, the "prison official must have a
sufficiently culpable state of mind," meaning that the
official was "deliberate[ly] indifferen[t] to inmate
health or safety." *Farmer*, 511 U.S. at 834. (citations
and internal quotation marks omitted). A prison official
cannot be liable for deliberate indifference "unless the
official knows of and disregards an excessive risk to
inmate health or safety; the official must both be aware
of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also
draw the inference." *Id.* at 837. "[S]ubjective
recklessness as used in the criminal law is ... the test
for 'deliberate indifference' under the Eighth
Amendment." *Id.* at 839-40.[45]

With regard to a claims based upon denial of medical care,

deliberate indifference to a prisoner's serious medical needs has

also been deemed to amount to cruel and unusual punishment under

the Eighth Amendment.[46] Such a finding of deliberate indifference,

though, "must rest on facts clearly evincing 'wanton' actions on

the parts of the defendants."[47] This subjective deliberate-

indifference standard is the same as recited above for a case based

upon a violation of conditions of confinement--the official must

know of and disregard the risk to inmate health, and be aware of

---

[45]*Blackmon v. Garza,* 484 F. App'x 866, 869 (5th Cir. 2012).

[46]*Estelle v. Gamble,* 429 U.S. 97, 104-106 (1976).

[47]*Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985); *see also Wilson,*
501 U.S. at 297.

facts to draw an inference that a risk of serious harm exists.[48]

As noted by the defendants Chapman and Pendergraft in their motions, it is important to clarify that Beard's remaining complaints about her housing from September through December 2009 occurred in a prison **hospital** setting in which Beard and certain other inmates had been "medically designated" for placement in that chronic-care facility within the institution.(MDS ¶ 6.) Under these circumstances, Beard's allegations do not arise to the level of a constitutional violation.

With regard to both defendants Chapman and Pendergraft, neither is alleged to be a doctor, nurse or other medical professional. (Amend. Compl. § V; MDS ¶¶ 4(B) and 6.) "'If a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'"[49] Accordingly, absent specifically pleaded facts showing a culpable state of mental state, a non-medical official "'will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.'"[50]

---

[48]*Farmer,* 511 U.S. at 837; *see also Reeves v. Collins,* 27 F.3d 174, 176-77 (5th Cir. 1994)(applying *Farmer* to a claim for denial of medical care).

[49]*Welch v. Tex. Tech. Univ. Health Serv. Ctr.,* No.2:09-CV-0291, 2012 WL 5986424, at *5 (N.D.Tex. Nov. 7, 2012)(quoting *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004), *rep. and rec. adopted,* (Nov. 29, 2012).

[50]*Id.; see also Johnson v. Doughty,* 433 F.3d 1001, 1012 (7th Cir. 2006)("A non-medical prison official . . . cannot be held deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor")(internal quotation marks omitted).

In this case, Beard's pleadings identify no facts showing that either Chapman or Pendergraft, the warden and a counselor, had any basis to interfere with the medical designations concerning which inmates were to be housed in the Chronic Care Unit, and in what manner there were housed. A *Bivens* claim requires a showing that the individual defendant was personally involved in committing some alleged wrong.[51] As to Pendergraft, the only alleged personal involvement with the housing placement in the Chronic Care Unit is Beard's claim that she made informal requests and filed a grievance with Pendergraft about her concerns. (Amend. Compl. § V; MDS ¶¶ 6, 10.) With regard to Chapman, Beard alleges that she brought up the matter with Warden Chapman at "Mainline." (MDS ¶ 4(A).) Importantly, neither Chapman or Pendergraft are alleged to have had any personal involvement in making the actual medical determination about how and under what conditions to house inmates, or remove inmates from, the Chronic Care Unit. Also, neither defendant is alleged to have interfered with or prevented medical staff from administering the Chronic Care Unit in the manner they determined to be proper.

Further, although Beard alleges that Chapman assured her that the "administration will look into it" but that "no changes occurred," and that a "cop-out" requesting the removal of the allegedly infected inmate was denied, she does not contend that her informal requests were ignored or set aside. The records provided

---

[51]*See Guerrero-Aguilar v. Ruano,* 118 F. App'x 832, 833 (5th Cir. 2004).

with Beard's amended complaint show that her grievances and informal requests about the conditions in the Chronic Care Unit were in fact considered and answered with written responses. (Amend. Compl., September 18, 2009 Inmate Request to Staff about housing conditions with inmate with possible staph infection, answered same day, attachment 30; Documentation of an Informal Resolution Attempt, with the counselor's comments section completed and returned to Beard). Furthermore, Beard was not prevented from participating in the formal administrative-remedy process, where her concerns regarding the Chronic Care Unit were addressed at the institutional, regional, and national levels. (Amend. Compl. attachments 8-16.) The fact that Beard disagreed with the resolution of this process and disagreed with the way the Chronic Care Unit was administered, does not relate to whether Chapman or Pendergraft, neither of whom is a medical professional, could be said to be deliberately indifferent to an excessive risk to inmate health or safety.

In sum, because Beard's allegations against Chapman and Pendergraft relate to her placement and housing in a medical-care unit under the care and direction of medical personnel, she has failed to allege sufficient facts to state a claim of violation of a constitutional right against them. Defendants Chapman and Pendergraft are therefore entitled to summary judgment based on qualified immunity because Beard has not satisfied the first element of the qualified-immunity analysis.

*ORDER*

Therefore, the following motions to dismiss, construed as motions for summary judgment, are GRANTED:

the April 22, 3013 motion of Hernan Reyes, M.D. (Doc. 26);

the April 22, 2013 motion of Bill Pendergraft (doc. 28);

the April 22, 2013 motion of Pedro Hernandez and Ronda Hunter (doc. 29); and

the June 26, 2013 motion of Elaine Chapman (doc. 42).

Plaintiff Beared shall take nothing on her remaining claims against defendants Elaine Chapman, Pedro Hernandez, Ronda Hunter, Bill Pendergraft, and Hernan Reyes, M.D., and such claims are DISMISSED WITH PREJUDICE.

SIGNED November 7, 2013.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

21